West-Ward Pharmaceuticals Our next case is Novartis Pharmaceuticals v. West-Ward Pharmaceuticals, Appeal No. 18-14-34. Mr. Zimmer, whenever you're ready. Thank you very much, Your Honor, and may it please the Court, David Zimmer on behalf of Appellant Westward. Your Honors, this is an unusual case in the sense that, although the District Court ultimately ruled for Novartis, many of its key factual findings actually supported Westward. Most importantly, the District Court found, and this is on page 20 of the appendix, that given the promising temsorolimus clinical data and the similarities between mTOR inhibitors temsorolimus and everolimus, that a skilled artisan would have been motivated to pursue everolimus as a treatment option for advanced RCC. That finding alone compels the conclusion that a skilled artisan would have been motivated to combine the prior art to practice the claimed invention. The District Court's factual findings also show why a skilled artisan would have reasonably expected that everolimus would inhibit RCC tumor growth. In addition to acknowledging the promising temsorolimus clinical data, the District Court recognized that the art disclosed a strong scientific basis for expecting that an mTOR inhibitor like temsorolimus or everolimus would inhibit RCC tumor growth. Specifically, inhibiting the mTOR pathway blocks the production of proteins that promote the formation of the new blood vessels that are needed for RCC tumor growth. The District Court's conclusion that a skilled artisan would not have reasonably expected success was based on both an erroneously heightened legal standard as well as factual findings that even Novartis concedes were incorrect. First, so you think for motivation that that finding that you referred to, that APOSA would have been motivated to pursue everolimus as one of several potential treatment options. That's on JA-20. You think that's inconsistent with the finding that defendants failed to prove by clearing convincing evidence that APOSA would have been motivated to select everolimus? Yes, that's exactly right. And I think that really the only basis for that later statement that Your Honor quoted was the former statement. The statement that there were other treatment options available. And this Court has made clear in cases like PAR VTWI and Bayer v. Watson that a proposed prior art combination does not need to be the best option. It does not need to be the most preferred option. It simply needs to be a suitable option from which the prior art does not teach away. Do you think that the judge here was confused in referring to selection language and maybe thinking this was a lead compound case or maybe thinking, you know, there's some law that would say, you know, say there's thousands of options in a pharmaceutical case. One of ordinary scale in the art, there might be some additional motivation required to select one out of a thousand or even a hundred. Is that what you think happened here? I think that may well be. I mean, you know, I can't guess. But why don't you tell us the kind of case in which the motivation to select would be pertinent? Well, I think that there may be a case . . . Because the language exists in our case law. As Judge Stoll suggests, in a lead compound case, in a case where there were, you know, there were tens of thousands of options and the district court said, might have concluded that there was no motivation to select this method at all, then it could be relevant. But that's not what happened here. I mean, the district court . . . Why is this not a lead compound case? Well, because this is exactly like PAR VTWI, where you have a method. It's a method of treatment. And you know, the question is basically whether a skilled artisan would have been motivated to pursue, you know, to select that method, to practice that method. What about obvious to try? Well, that's, you know, that sort of gets more to the reasonable expectation issue. But you know, the issue is for motivation . . . Why is that so? Well, because we're not making an obvious to try argument. The issue is whether a skilled artisan would have been motivated to combine these prior art references to practice the claim to mention. And the district court effectively found that a skilled artisan would have been motivated to do that. That's what that finding on page 20 says. But what he then . . . I'm just wondering why the obvious to try isn't also directed right at the motivation to combine. Oh, well, I mean, it may be . . . It's got a way of saying the same thing. Why isn't it? Well, it may be in the sense that obvious to try isn't the standard, but that's not what we're arguing. The question here is just . . . I know that's not what you're arguing, but I'm trying to figure out what the right way of going about a case like this to decide whether or not you would combine the existing references. Well, I think the analysis is actually . . . Assuming you say, well, the whole notion that there was a motivation to select a particular reference, and now we're going to throw that aside. Well, I don't think there really is . . . I think under cases like Parr and under cases like Bayer, that when there is a finding in this case where there's a limited set of options, the district court described there as being several potential treatment options available, that when you have a finding that the asserted prior art combination is one of those several options, and there's no showing of teaching away, then . . . What is it you're trying to combine? You keep talking about a motivation to combine. Sure. So the asserted . . . What pieces of art are we going to combine? Right. So the asserted art combinations are either Hidalgo 2000 or Hutchinson, which disclosed the use of temsoralimus to inhibit the growth of advanced RCC, with the everolimus patents, the 972 and 773 patents, which disclosed the compound everolimus as an mTOR inhibitor, like the compound temsoralimus, and that's always been our motivation theory. And I think what the district court found on page 20 of the appendix is precisely that a skilled artisan would have been motivated to make that combination, would have been . . . Would have been motivated to try everolimus as one of several potential . . . One of several potential treatment options, absolutely. But under cases like Parvy-TWI and Bayer v. Watson, that is a motivation to combine. It doesn't need to be. The proposed combination doesn't need to be the best option. Sure, but that's just half the test. I mean, once you . . . Exactly. You say, yeah, but what you're going to do, was there a reasonable expectation of success? Absolutely. So you have a fact-finding here, based on all the expert testimony, in which the district court judge says, nope, I don't think you've satisfied that test. Well, that . . . So . . . Right. And so that gets us to the reasonable expectation in . . . Correct. And isn't that the . . . I mean, you've spent half your time in oral argument talking about motivation to combine. That doesn't get you a nickel, unless you can upset the other holdings. Absolutely. And so let me turn to . . . Some . . . Let me turn to that. You said oral argument ought to go to where your vulnerability is. Yeah, well, I was just responding to the questions, but let me get to the . . . I'd like to get to the reasonable expectation issue, because we think that the district court's decision as to that issue was also based on, really, a fundamental legal error, but also on key factual errors. And let me . . . Explain the fundamental legal error you think the court made. So, the legal error was really to focus . . . was this excessive focus on specific statements in the prior art that showed areas for further research. And I think it's really the precise mistake that led this court to reverse the factual findings in Pfizer v. Apotex, where the court relied too heavily on small, identified uncertainties without focusing on the bigger picture of what the art actually taught here. And that legal error was really compounded by the fact that the proportion . . . Why is that a legal error? Well, I mean, I think that . . . Why is it putting more emphasis on one fact than on another, a legal error? Well, I think it misunderstood . . . this court's reported . . . repeated statements that the reasonable expectation of success does not need to be a certain one. So, that's really . . . I mean, if it's a fact . . . you know, I think it's fine if it's . . . if the conclusion is that it's a factual error because the district court sort of erroneously weighed the evidence in that sense. Well, yeah, you don't want it to go there because the standard review . . . Well, right, and I think . . . . . . accredited you, but, yeah, I'm not having trouble seeing where there's . . . what Judge Plater suggested that there's a legal error issue here for us to look at . . .  . . . on this topic. I mean, as we interpret the Fizer v. Apotex case, what this court basically said is that it is a legal error to, you know, to basically require a certain expectation of success by discounting . . . or by placing excessive emphasis on sort of limited uncertainties in the art, statements in the art that there are . . . that there are uncertainties that need to be confirmed rather than focusing on what the art affirmatively teaches. But even if it is a factual error here, we think that there's no question the district court committed clear error, and that's largely because there are two key factual findings that even Novartis does not defend, and these are the factual findings on page 13 of the appendix about the Maxwell reference and about the Zhang 1999 reference. As to Maxwell, the district court largely agreed with Westward that Maxwell taught . . . Maxwell's theory favored our position in the sense that Maxwell taught that HIF-1 overexpression leads to angiogenesis and leads to tumor growth, and that using . . . but then the district court discounted Maxwell based on Maxwell's statement that it was unclear whether this HIF-1 overexpression leads to oncogenesis, the formation of cancer. But as we explain in our brief, and Novartis doesn't really dispute, this is on page 44, whether or not mTOR inhibition will prevent oncogenesis, will prevent the formation of  It's not even about preventing the formation of tumors. It's about inhibiting the growth of tumors that already exist. And so that finding really has no basis in Maxwell, and the district court similarly concededly erred in interpreting the Zhang 1999 reference in concluding that it found that only one of two advanced RCC samples showed HIF-1 overexpression. And again, Novartis doesn't defend this finding. Pages 45 and 46 of their brief, they concede that that's wrong, that Zhang 1999 actually looked at only one sample of advanced RCC and found that it showed the highest observed levels of HIF-1 overexpression, and then went on, and this is at 2190 of the appendix, to specifically identify HIF-1 overexpression as a feature of advanced RCC. And these two findings were very important to the district court's ultimate decision. If you look at page 22 of the appendix, the district court specifically noted uncertainty concerning the role of HIF-1 in RCC tumor growth as one of the few facts, the few facts on which it relied in finding no reasonable expectation of success. And that statement about the role of HIF-1 clearly relates back to these two conceded factual errors the district court made in interpreting Maxwell and Zhang 1999. And so I think if you strip away these conceded factual errors, you strip away this erroneous reliance on isolated statements about uncertainty, that the ART really all points the same direction. You have this strong scientific basis for expecting that an mTOR inhibitor like everolimus will inhibit tumor growth. You have this phase one clinical data that the ART repeatedly characterized as showing impressive antitumor activity, as showing profound inhibition of tumor growth. The 446 patent looks at this data and concludes that temsorolimus is useful in the treatment of advanced RCC. But phase one doesn't address that issue. If I remember correctly from my work at HHS, phase one only addresses the question of safety, not effectiveness. So that's what those studies are targeted at. But that's exactly why reference after reference in this case found these showings of effectiveness to be particularly surprising and particularly noteworthy. So the 446 patent, and again, this is at 2578 in column four, specifically describes these as being surprising because they came in a phase one study. Because of the low dose. Sorry? Because of the low dose. Exactly. And Hidalgo 2000. Look what you just did. That will do you. The whole notion is, look what you're seeing with a very low dose. Exactly. Let's crank it up and then let you see. Exactly. And so that's what the 446 patent says. Hidalgo 2000 reaches exactly the same conclusion in suggesting that these results are particularly noteworthy because they came in a phase one study in which effects are often limited. And so I think reference after reference actually found the fact that these were phase one studies to be particularly revealing, particularly probative, and particularly surprising. And I think that especially given that that promising phase one data was backed up by the strong scientific explanation of why a skilled artisan would expect inhibiting the MRCC tumor growth, that those two things together provide at the very least a reasonable expectation that inhibiting the mTOR pathway would inhibit tumor growth. You're into your rebuttal time. Would you like to preserve your time? Yes, absolutely. Thank you. May it please the court. Westward has not established that the district court made any reversible error in its analysis of reasonable expectation of success or motivation, let alone both, which it must do to succeed on this appeal. How do you explain these seemingly inconsistent statements in the district court's opinion on motivation to combine? There's no dispute that an obviousness analysis requires consideration of the art as a whole and cannot be based on hindsight. The person of ordinary skill can't start with the patent claims in hand and then work backwards with the art. They have to start by looking at the art as a whole because they don't have the solution. But there's no dispute that Dr. Cho, Westward's expert here, used hindsight, started with the patent claim and only looked at Everolimus. He never looked at the art as a whole. Is this your answer to address the district court's two seemingly inconsistent fact findings? The district court here based its conclusion on the fact that Westward's expert performed the wrong legal analysis. He used hindsight and he never considered the art as a whole. And for that reason, Westward and Dr. Cho failed to meet their burden on the motivation prong of the analysis. If you can assess motivation with hindsight. What do you think the district court meant when it said Opposa would have been motivated to pursue Everolimus as one of several potential treatment options for advanced solid tumors, including advanced RCC? Well, that language is less than clear that judge may have been using an obvious to try type standard in that statement. But there's no dispute here that Dr. Cho used hindsight in his motivation analysis and never looked at the art as a whole. That's an undisputed fact. And for that reason alone, the district court's decision on motivation has no reversible error. Why do you think the court then said where it said defendant has failed to prove by clarifying and convincing evidence that Opposa would have been motivated to select Everolimus? Why was the word select used there? Was the court referring to some kind of lead compound analysis? It's possible that that's what the court was referring to. But coming back to my point, there's no dispute here that Dr. Cho did use hindsight in his motivation analysis and that's not permitted. And for that reason alone, we think the district court's motivation conclusion should stand. So I'll turn now to reasonable expectation of success. There's no evidence here that the district court applied the wrong legal standard in its reasonable expectation of success conclusion. The judge repeatedly and consistently articulated the correct standard for obviousness and never suggested it required certainty. And regardless of specific language and individual fact findings, that doesn't mean the judge applied the wrong standard in his ultimate conclusion that there was no reasonable expectation of success under the clear and convincing evidence standard. The district court's ultimate conclusion took into account the flaws and the knowledge gaps in each aspect of Westward's case. And those rise far above the level of just some general uncertainty. They include Westward's reliance on clinical study data that was subject to many undisputed limitations and that was designed to assess safety and not even powered to evaluate efficacy. It included Westward's reliance on hypotheses that required further analysis, inconsistent results in the prior art, and oversimplification of the mTOR and HIP-1 pathways. The district court both correctly articulated and applied the correct legal standard for I'll turn now to Westward's allegation that the district court erred in its factual conclusion of no reasonable expectation of success. And that conclusion was not clear error. It was supported by three categories of fact findings relating to the limitations on the phase one study data, the differences between mTOR inhibitors, and the knowledge gaps in Westward's molecular biology argument. In nitpicking individual fact findings, Westward ignores the totality of the evidence that supported the district court's conclusion, including the admissions of its own expert, Dr. Cho. Now the first category of those factual findings are those that relate to the phase one data for temsorolimus, which is a different drug than the claimed drug everolimus. The district court did not err in analyzing the preliminary phase one temsorolimus data or statements about that data. The district court carefully considered those studies and the data in context and recognized their limitations. The district court judge recognized that those studies showed promise, right? The judge used the word promise in one individual fact finding, but that doesn't mean there's a reasonable expectation that the drug would work. We need to look at the studies in context. What we need to look at is the emphasis that the judge put on each of the relevant data points in the factual analysis, right? And you add those up to see whether or not, once you've added up the findings on the data points, whether or not one would have had a reasonable expectation of success. That's correct, Your Honor. And you've got prior phase one tests on a compound that is kissing cousin or brother, sister. How do you describe it? It's certainly related to Avramos, right? There is some structural similarity between the two compounds. And we do need to look at all of the data points. And the data points we need to consider, including the statements about the promising data that counsel referred to, are those about the undisputed limitations of those phase one studies. The district court found that those studies were designed to test safety, not efficacy. And because they weren't even powered to determine efficacy, that's undisputed here, the district court didn't err in refusing to give the data, statements about that data, the elevated weight that Westward suggests that we should give those statements or that data. The studies were also uncontrolled. They reported only a small number of RCC responses. And the trials were not specific to RCC patients, renal cell carcinoma patients in particular. So we don't know how many RCC patients were enrolled or what percentage of those patients had a response or no response at all. The data here was only preliminary. These trials were still ongoing. So we only have interim preliminary data, not final data. And those results were subject to change in the final study publications, which were not yet published. Also, as of 2001, mTOR inhibitors were a relatively new line of research for RCC. No mTOR inhibitor had been approved for any type of cancer. And one of ordinary skill would have also been aware of the fact that there was a dismal success rate for cancer drugs generally and RCC drugs in particular. The district court here recognized these undisputed limitations and took them all into account in deciding to reduce the weight afforded to the preliminary phase one data. Now, even if that preliminary phase one data had shown that temsorolimus was effective in the claim methods, that doesn't provide a reasonable expectation that everolimus, the claim compound, would also be effective. And that brings me to the second category. Why not? What are the distinguishing features of the two compounds that allow you to say, to demonstrate what you just said? So as the district court correctly found, there were differences between the two compounds in terms of their biological and pharmacological properties that were relevant to inhibiting growth. These included differences between the compounds in terms of their half-lives, binding to FKBP12, as well as the relationship between dose and area under the curve. I'll turn now to... What impact would the half-life have, the difference in half-life? So Dr. Burris, Novartis' expert here, testified that all of those differences taken together would lead one of ordinary skill... Specifically, my question is specific. What difference would the half-life make? So Dr. Burris testified that differences in half-life will lead to differences in efficacy, whether or not a compound is active or inactive against a specific tumor. He testified that half-life is a complex function of drug distribution, biotransformation, and elimination, and all of these facts would create differences... Half-life. Do I understand correctly that half-life is the amount of time that the drug will be in the body before, I guess, it's metabolized? That's correct. It's essentially the amount of time the drug is in the body before it's metabolized or eliminated or moved to a different... That can have an impact on how it impacts the body and the growth of the tumor? Is that what the expert said? Yes. Yes, that's correct. Half-life, in combination with FKBP12 binding, also has an impact. And there's a significant difference in the half-lives here. Tempsorolimus has a half-life of 15 hours. Everolimus has a half-life of 60 hours. So these are not similar... Well, the problem is they don't, frankly, know whether or not the half-life difference makes any real difference for purposes of this pharmaceutical or not. That's a question. We simply don't know because... If there's a question there, then the question undermines the notion that you would have a reasonable expectation. That's correct. We simply don't know. When this patent was filed, Everolimus, the claimed compound, had never been tested as an anti-tumor agent in any tumor at all. And I'll turn now to the molecular biology argument, which is the third category of facts that support the district court's conclusion. Now, Westward has overstated what was known about molecular biology of RCC in 2001. There was no established causal connection between HIF-1 overexpression and RCC growth, as they've suggested. The district court found correctly that there were knowledge gaps in this understanding and only a working hypothesis of RCC's molecular biology. This evidence did not rise to the level of clear and convincing evidence of a link between inhibiting mTOR and inhibiting RCC growth. And counsel for Westward referenced factual findings with respect to Maxwell and Zong 1999, and it suggested that Novartis has conceded that there were errors in the district court's conclusion. We certainly don't concede that. Novartis doesn't concede, right? With respect to the Maxwell statement that Westward has emphasized, that statement was merely a hypothesis. Hypothesis. That's the language that the district court used in its decision. A hypothesis that HIF-1 activation may be linked to angiogenesis in certain tumors. And Westward also referenced a statement in Maxwell about oncogenesis, but its explanation for why that statement is not relevant, that's a new argument on appeal that was not presented to the district court. It also has no expert support. Dr. Cho, their expert, never testified that oncogenesis was not relevant to the claimed invention. He said only that oncogenesis was different from angiogenesis. That doesn't address the issue here. And as for Zong 1999, even though the district court did mistakenly suggest that both RCC samples there were advanced RCC samples, when only one of the two samples was an advanced sample, that error is harmless. It doesn't impact the court's statement that the ART reported mixed results for HIF-1 expression in RCC. The district court also relied on Symenza for that point. Symenza also reported mixed results for RCC in cell line and biopsy samples. And Westward hasn't disputed the district court's reliance on Symenza in this appeal. And even if we were to accept Westward's interpretation of Zong 1999, its own expert testified that Zong would have only suggested that additional investigation of HIF-1 may make it an attractive and a novel target for therapeutics. So, again, its own expert is expressing the opinion that additional research is required to link HIF-1 to RCC growth. On top of this, research on mTOR inhibitors was only at the early stages. No mTOR inhibitor had been shown to be therapeutically effective in any cancer. And as I mentioned, there was no preclinical or clinical data for Everolimus as an antitumor agent. Also, Westward's expert, Dr. Cho, admitted that tumors could proliferate despite mTOR inhibition. So just because you inhibit mTOR, that doesn't provide a reasonable expectation that you will inhibit tumor growth. Unless your honors have any additional questions? Anything else? Thank you. Where do you begin? Well, let me just try to take these three in turn. I realize I don't have a ton of time. But as to the data, I think the most important thing here is to look at the way the art itself characterized this data. And this is over and over again. I mean, Hidalgo 2000, this is a 2028, describes the data as showing impressive antitumor activity. The 446 patent concludes that the data shows that temsorolimus is useful in the treatment of renal carcinoma. So all of the district court's findings as regards to the limitations of the data fly directly in the face of what the skill of the artisans, the art references themselves, how they characterize the data. And especially, I'd just like to focus on the number of this issue on which counsel focused quite a bit on, the number of RCC patients. Dr. Cho testified, and this is at 1112 to 1113, that a skilled artisan would have expected based on the prevalence of advanced RCC in the population that the number of RCC patients in the sample would be small. And that is unrebutted testimony, and it's consistent with what the art itself said. So at 2031, Hidalgo 2000 describes these results as showing consistent, uses the word consistent tumor suppression. And again, I think that undermines any suggestion that there was actually some huge number of RCC patients who were not showing success. In terms of the difference between the mTOR inhibitors, if you look at the art that discusses mTOR inhibitors as a whole, so if you look at, for instance, the Huang reference or Hidalgo 2000 or Zhong 2000, these references treat these compounds as a class. There's no suggestion in any of these references that one mTOR inhibitor might work and one might not. And that makes sense because they're doing the same thing. Now, does that mean they're going to have exactly the same efficacy? No. And Dr. Cho acknowledged this. This is at 987, but testified that a skilled artisan would have expected the inhibitors to behave similarly. And Dr. Burris actually never disputed that. If you look at 1399 to 1402 of the appendix, he testified that a skilled artisan would not have expected the two mTOR inhibitors to be the same. But whether they're the same isn't the question. The question is whether a skilled artisan would have understood them to behave sufficiently similarly that an artisan would look at this temsorolimus data and expect it to show similar results in the context of everolimus. And again, I think the way the art characterized these references, the way the experts testified, it all points the same way. And the binding affinity and elimination half-life issues are really just—they don't contradict that at all in the sense that there's no evidence that any of those differences have any clinical effect. So if you look at the Shuler reference—this is at 2088 of the record—Shuler specifically says— There's no evidence that they don't have that effect. Well, yes. So that's what I'm getting to. Shuler specifically says that despite the differences in binding affinity between everolimus and rapamycin, that the two drugs are equipotent. And Shuler actually uses this word at 2088. So the evidence suggests that while these differences may exist, that they don't have these clinical effects. And all of the references and all of the testimony suggest that a skilled artisan would have understood these references—would have understood these compounds as behaving similarly. Ultimately, the trial judge's problem is to determine whether all that body of evidence is causative. Isn't that right? Well, whether a skilled artisan would have viewed it as creating a reasonable application. The question is, which direction is it pointing in? Is it pointing in any direction at all? And if so, sufficiently so? Correct. Absolutely. And we think— Is that a question of fact or is that a question of law? Well, ultimately, it's a question of fact. I mean, I think that the way any individual reference points is going to be a factual question. But again, we think that most of these findings, if you actually compare what the district court concluded to the art itself, and even to the expert testimony, that it just doesn't get to where the district court got. The burden is clear and convincing, right? That's right. Absolutely. That's a lot. It takes a lot of evidence to be clear and convincing. It does. And we think that this is a case where that evidence exists. It's actually unusual to have this kind of clinical data and scientific art that all points in the same direction. And notably, there's no secondary considerations evidence here. There's no teaching away evidence. There's nothing pointing the other way. But the trial judge was not convinced they all point in the same direction, was he? Well, actually, I think he was. I think what the trial judge said was that some of it, there was some grounds for uncertainty. But nothing, the trial judge identified nothing suggesting that any of this pointed away from these compounds working. I think what the trial judge found, again, we would say- Your burden is to show the evidence pointing at it will succeed. It's going to work. Well, respectfully, no, Your Honor. Our obligation is to show that a skilled artisan would have had a reasonable expectation. Not necessarily that it would. This court has made that abundantly clear that a reasonable expectation is not certain. Well, that reasonable expectation makes the test a fudgy one, right? Well, I suppose that's one way of putting it. In whose mind is it reasonable? In the mind of a skilled artisan as of the priority date. And I think that under cases like O'Farrell on Pfizer, the record here really compels a conclusion that the expectation of success was at least reasonable. I see my time has expired. I'm happy to answer any more questions. So there really are two vague ideas we're working with. One of them is what is reasonable. And what did the judge think a skilled artisan would think was reasonable? Isn't that fair? Yes. I mean, I think they're kind of- I guess you can separate them out on that one. I think the question is, you know, whether the trial judge here permissibly concluded that a skilled artisan- If we treat that as a question of fact, we have to conclude for your benefit that there was clear error in the trial judge's estimate of where everything pointed. Isn't that right? That's right. Although, again, I would note that despite Novartis saying that they didn't concede these factual errors, they effectively still conceded them. And I point to pages 44 and 46 of the brief. So I think there's no question that at the very least, the district court's conducting that inquiry rested on several sort of conceded mistakes about what the art actually taught. So I think that certainly has to be factored in to the bigger picture as to, you know, whether- And what is our job? To determine whether the evidence all points that way, or whether even putting aside the case beyond a clear and- Yeah. I think this court has described a clear error standard as something along the lines of, you know, a distinct sense that a mistake has been made or something like that. And so I think that's the question. The question is, sort of, once you take away what are effectively conceded factual errors, once you take away what we argue is the excessive reliance on uncertainty in the art- The district court listens to the experts and becomes more persuaded by one than by another. So that's right, Your Honor. But I think it's notable here along those lines that the district court actually didn't make any adverse, any credibility findings about the experts. The district court actually relied- No, it just lets it all come in. Absolutely. And he, in fact- You've got someone that says half-life doesn't matter. Half-life wouldn't possibly make any difference at all in this type of a setting. And the other side's got somebody who said, well, it might. Well, again, I point out there that what the other side said was that half-life, what a skilled artisan would understand from these half-life data is that a skilled artisan would not have expected these compounds to behave in the same way. And again, I point the court to 1399 to 1402. You can actually look at what he said. He never actually disagreed that a skilled artisan would understand these compounds as behaving similarly. And that's really the question. It doesn't matter whether a skilled artisan would view the compounds as identical or having the same efficacy. The question is whether the data would translate. Thank you very much. Thank you. Case is submitted.